UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
AMERICAN AIRLINES, INC.                         :
                                                :    No. 09-cv-4535 (LAK) (HBP)
                              Plaintiff,         :         ECF Case
                                                :
           v.                                   :    **COMPLAINT**
                                                :    [JURY TRIAL DEMANDED]
                                                :
CHARLES F. IMHOF,                               :
                                                :
                              Defendant          :
                                                :
-------------------------------------------------------------X

Plaintiff, American Airlines, Inc. ("American"), through its attorneys McKool

Smith, for its Complaint against Defendant, Charles F. Imhof, alleges upon knowledge as to

itself and its own actions and upon information and belief as to all other matters, as follows:

### NATURE OF THE ACTION

1.      American and Delta Air Lines, Inc. ("Delta") are two of the world's

largest airlines and head-to-head competitors in many markets, particularly New York.  Delta

recently hired Charles F. Imhof, one of American's highly-compensated managing directors,

who was the highest-ranking employee in New York for Passenger Sales.  Despite multiple

confidentiality and non-disclosure agreements, right before he resigned Mr. Imhof e-mailed key

information comprising American's New York strategy to a relative's personal e-mail account,

and copied multiple documents to a personal, external drive, in violation of multiple agreements,

American's Standards of Business Conduct, and applicable law.  Moreover, in the identical high-

ranking position for Delta, Mr. Imhof cannot help but use -- if not disclose -- American's highly

sensitive competitive information relating to its customers, strategy, routes, and pricing.

Accordingly, American brings this action to enforce Mr. Imhof's common law and contractual

obligations, to safeguard American's confidential, proprietary, and trade secret information, and to prevent unfair competition, computer fraud and abuse, and irreparable injury to American's business interests.

2.        Until April 28, 2009, Mr. Imhof was an employee at American with 22 years of service to the organization.  When Mr. Imhof tendered his resignation, he held the position of Managing Director New York Division Passenger Sales.  In this position, Mr. Imhof was privy to -- and developed -- highly sensitive proprietary, confidential, and trade secret information.  This information included marketing and business strategies, financial and pricing information, and customer and contractual information.

3.        American took appropriate efforts to safeguard its competitively sensitive information.  For example, American maintains and enforces its Standards of Business Conduct, which outline, among other things, its policy relating to confidential and proprietary information.  American also requires certain key employees, which included Mr. Imhof, to certify each year that they are in compliance with the Standards.

4.        Additionally, American has handsomely paid Mr. Imhof through deferred compensation, performance awards, and stock options.  Before receiving benefits from certain of those awards, Mr. Imhof agreed to safeguard and not to reveal American's confidential and trade secret information.  Indeed, in reliance upon those agreements, over the course of the past several years, Mr. Imhof has received substantial compensation that he would not otherwise have received without those promises.

5.        Despite company practices and policies and multiple agreements that he would safeguard confidential, proprietary, and trade secret information, Mr. Imhof recently informed American that he intended to become employed by Delta immediately following the

2

termination of his employment with American in a high-level strategic position that is virtually identical to the position he last held at American. Delta is one of American's largest competitors in New York, and Mr. Imhof cannot help but unfairly leverage his use of unique knowledge and specialized skills derived from his position at American to benefit Delta. Moreover, Mr. Imhof has misappropriated certain documents and information from American. Consequently, Mr. Imhof has breached his contractual, common law, and fiduciary obligations to American, and will continue to do so if not enjoined.

6.      Although Mr. Imhof already has begun work at Delta, Delta had instructed Mr. Imhof not to perform any work or contact any customers, including those with whom he had contact while at American. Delta, however, notified American that Mr. Imhof's employment will be unrestricted at 10:30 a.m. on May 14, 2009. Accordingly, an injunction is necessary to and will preserve the status quo.

## PARTIES

7.      Plaintiff American Airlines, Inc. is a corporation duly incorporated and existing under the laws of the State of Delaware with its principal place of business located in Fort Worth, Texas.

8.      Defendant Mr. Imhof is a resident of the State of New York, residing at 5 Arbor Land, Merrick, New York 11566.

## JURISDICTION AND VENUE

9.      This action is commenced pursuant to Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

10.      This Court has subject matter jurisdiction over the claims asserted herein pursuant to 28 U.S.C. § 1331 because there is federal question jurisdiction relating to a cause of action raised herein under 18 U.S.C. § 1030, and there is supplemental jurisdiction pursuant to

3

28 U.S.C. § 1367 over all other claims because they are so related to the claim in the action within original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

11.    This Court also has subject matter jurisdiction over the claims asserted herein pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship and the amount in controversy exceeds the sum of $75,000, exclusive of interests and costs.

12.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because, as further described below, a substantial part of the events and omissions giving rise to American's claims herein occurred in this district.

## FACTUAL ALLEGATIONS

13.    American is one of the world's largest airlines.  It, along with American Eagle Airlines and AmericanConnection®, serve 250 cities in 40 countries with, on average, more than 3400 daily flights.  The combined network fleet numbers more than 900 aircraft. American Airlines is based in Dallas/Fort Worth, and also operates major hubs at Chicago O'Hare International Airport and Miami International Airport.  American also has significant operations at Boston Logan International Airport, Los Angeles International Airport, Raleigh-Durham International Airport, LaGuardia Airport, and JFK International Airport.  Until recently, American was the world's largest airline.

14.    Delta is now the world's largest airline.  It has hubs in Atlanta, Cincinnati, Detroit, Memphis, Minneapolis-St. Paul, New York-JFK, Salt Lake City, Amsterdam, and Tokyo-Narita.  Delta reports on its Web site that "its Northwest subsidiary and Delta Connection carriers offer service to 368 destinations in 66 countries and serve more than 170 million passengers each year."

4

Dallas 277284v5

### A.    Mr. Imhof's Employment with American

15.    Mr. Imhof worked for American for 22 years.  He started as an Account Manager in New Jersey, and then held positions as a City Manager, District Sales Manager, and Regional Sales Manager.  In May 2005, American promoted Mr. Imhof to Managing Director New York Division Passenger Sales, a position that he continued to hold until he resigned on April 28, 2009.  He also recently was given the title of Vice President of the Greater New York/New Jersey Division.  Mr. Imhof was employed in American's offices located in New York, New York, and he traveled to American's headquarters in Texas from time-to-time for American business.

16.    Mr. Imhof was the senior-ranking employee within the New York Sales Division.  Mr. Imhof has unique expertise, which he gained from the confidential, proprietary, and trade secret information he received from, while working at, and being paid by, American. In his position as Managing Director New York Division Passenger Sales, Mr. Imhof was responsible for managing all aspects of American's passenger sales in the New York Division. These responsibilities included managing the New York Division sales organization, developing the New York City Sales Strategy (including domestic and international strategies), assessing market data, identifying key industries and businesses to target as customers and developing and implementing related strategies, assessing the travel agency environment and developing related strategies, negotiating contracts with customers (including corporate customers and travel agencies), assessing and implementing sponsorships in the greater New York area, participating in state and community affairs strategy, and participating in corporate communications initiatives.  Moreover, as Managing Director for one of the four geographic regions, Mr. Imhof participated in American's monthly meeting of global senior sales leaders ("Sales Board"), and

was therefore privy to American's global passenger sales strategies and other company strategies.[1]

17.    Mr. Imhof entered into discussions for potential employment with Delta on or about March 17, 2009.  In the midst of his discussions, he told at least one of American's travel agency clients in the New York market that he was considering leaving American to work for Delta.

18.    Throughout late March and into mid-April 2009, Mr. Imhof met with Delta executives to discuss his prospective employment.  However, while conducting these discussions in late March and mid-April, Mr. Imhof continued to actively participate in important meetings relating to American's New York sales strategy.  In particular, on April 6, 2009, Mr. Imhof participated in a corporate review in which he spent four hours reviewing statistics relating to all of American's important New York market accounts.  Those statistics indicated which accounts were performing well, which were performing poorly, and which accounts had upcoming renewals and requests for proposals.  Ironically, Mr. Imhof also discussed American's competitors during that meeting, specifically including Delta and what American perceived Delta was doing in the marketplace and the challenges associated with Delta's conduct and recent merger with Northwest Airlines.

19.    At no time during the April 6 meeting did Mr. Imhof reveal that he had recently met with Delta's head of New York operations and Vice President of Sales, or that he was planning on meeting with Delta's senior executives.  Nor did he excuse himself from the meeting to avoid discussing or developing any competitively sensitive information.  Similarly,

[1] During Mr. Imhof's tenure as managing director, Passenger Sales was comprised of four geographic divisions:  Eastern, Central, Western, and New York.  In the wake and as a direct result of Mr. Imhof's sudden departure from American, the New York Division was rolled into the Eastern Division, at least temporarily.

Dallas 277284v5

Mr. Imhof then participated in the Sales Board meeting in Dallas on April 16, 2009, and neither informed participants that he was meeting with Delta relating to potential employment, nor excused himself from those meetings.

20.    The information discussed in these meetings is competitively sensitive and, if Delta were to have access to the information, it would provide Delta with an unfair advantage and put American at an unfair disadvantage.  In performing his intended job duties and responsibilities with Delta, Mr. Imhof cannot erase from his consciousness or manage not to use (even if he does not audibly disclose) American's confidential information such as renewal/expiration dates for upcoming contracts, discounts, customer preferences, and particular routes of interest, when negotiating contracts or planning strategy for Delta.  Therefore, Mr. Imhof inevitably will use or disclose Americans' protectable information in favor of Delta.

21.    Moreover, while negotiating his term sheet with Delta, Mr. Imhof had lunch with one of New York's largest travel agencies (and an American customer).  Given the progress of those negotiations, Mr. Imhof should have cancelled that meeting or made certain that another American employee joined him.

22.    Mr. Imhof's position provided him with substantial and intimate knowledge of American's trade secrets, business opportunities, strategies, customer relationships and preferences, and business development initiatives.  In particular, American entrusted Mr. Imhof with crucial, current, confidential, and proprietary information and trade secrets, including American's:

(a)    new back-end travel agency compensation program, Top MAArks, which American developed in the fall of 2008 and implemented in the first quarter of 2009, as well as the travel agencies' responses to this new program, the difficulties and challenges imposed in

7

implementing the program, and which targeted agencies American desires to enroll in the program;

(b)     <u>upfront commission policy</u>, including access to all information and involvement in decision-making for American's upfront programs which provides agencies with percentage of ticket value or fixed dollar commissions at time of ticketing.  This information includes terms, levels, and agencies on the program;

(c)     <u>corporate contracts and active requests for proposal</u>, including which contracts are up for renewal or are coming up for renewal, the discounts and incentives American provides those customers (including for certain routes, fares, and classes of service), those customers' level of satisfaction with their prior contracts and current negotiations, and the unique initiatives American has been implementing for its corporate contracts to enhance its customers' performance on American's network, as well as vulnerabilities as to specific corporate accounts and travel agencies.  This information is incredibly useful and valuable because it constitutes American's strategy to retain its current corporate customers so that they renew their contracts with American instead of contracting with Delta or reducing the level of business they put on American;

(d)     <u>route profitability</u>, including the decision factors American has applied in recent months regarding whether to maintain or cutback on certain routes in the New York market;

(e)     <u>sales strategy</u>, including the targeted marketing segments, industries, accounts, and desired sizes of accounts upon which American has been focusing, as well as the new mechanisms that American has been developing to assist in this sales strategy;

8

(f)    <u>initiatives to generate revenue to offset rising fuel costs and the economic climate</u>, including the discussions relating to American's sales strategies to deal with those factors, particularly in the New York market; and

(g)    <u>competitive strategy</u> to market American against its key competitors, particularly including Delta, including route preferences, corporate sponsorship, and advertising.

23.    The sources and forms of information identified in the foregoing paragraphs, which Mr. Imhof had access to, received, and had responsibility for, constitute the confidential and proprietary information and trade secrets of American.  American has expended significant resources in developing that information, as well as garnering the goodwill of its corporate customers and travel agencies who contract with American.  American takes measures to keep this information confidential, and it derives independent economic value from this information because it is not generally known to competitors, including Delta.  Disclosure of this information to American's competitors would harm American's business because it would provide those competitors with proprietary and non-public information regarding American's New York Passenger Sales Strategy.  In essence, it would provide American's competitors with American's playbook.

24.    In a competitor's hands, this information would allow a competitor to anticipate and counteract American's actions in the market place, as well as build a strategy to target certain clients, industries, and businesses, as well as travel agencies, that constitute a significant portion of American's passenger sales (and revenue) in the New York Division. Armed with that knowledge, American's competitors would be in a position to undercut American's relationships, understand American's identified target customers, and negotiate superior contracts with American's corporate customers and travel agencies.  Additionally, if

9

American's information relating to route profitability and airline competitive strategy were to become known to American's competitors, they would be at an advantage because they would be able to anticipate and understand the reason for certain routes, and could undercut American's service and potentially drive American out of that market.

25.     This would place American's competitors, including Delta, at a competitive advantage because American's passenger sales strategies and route profitability is the core of its business and two of its most valuable assets.  Mr. Imhof obtained this information because of his position at American, and in reliance on his compliance with American's Standards of Business Conduct, his obligations to the company, and his agreement to multiple agreements (for stock options, performance awards, and other deferred compensation) containing confidentiality provisions and pursuant to which Mr. Imhof received substantial compensation. Disclosure of American's confidential and proprietary information and trade secrets would cause American to suffer irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which money damages alone would be inadequate to compensate American.

26.     In addition to having information in his memory that Mr. Imhof cannot help but use for Delta to unfairly compete against American, upon information and belief, at the moment Mr. Imhof decided to resign, he misappropriated American's New York Passenger Sales strategy playbook:  a 115-page color PowerPoint presentation.  Mr. Imhof forwarded this presentation, and the accompanying e-mail, which discussed thoughts relating to the Delta/Northwest Airlines merger, to an outside e-mail account presumably belonging to a relative.  Mr. Imhof recognized the confidential and trade secret nature of the information, as he previously told those to whom he'd provided this exact information, "Don't forward . . . ."

27.    The presentation Mr. Imhof misappropriated constitutes American's New York market Passenger Sales strategy.  It contains American's New York City Sales Strategy, including its New York/international strategy.  Moreover, the document specifically lays out information relating to American's sales organization, market and competitive research (relating to New York, and American's competition, and the international market), travel management agencies (including structure, compensation, and identification of key agencies), pricing, commission, and other discount information and strategy, an "attack plan," opportunities, and potential and particular pipelines for business, promotions, sponsorships, and governmental activities.  In sum, this document is American's New York Passenger Sales playbook, and he sent it to an outside e-mail account just when he came to terms on a new job with Delta.

28.    Mr. Imhof's actions were unprecedented, unwarranted, and unauthorized, and have caused, and threatens to continue to cause, American irreparable injury.

29.    Mr. Imhof further is well aware of the status of each of the initiatives set forth in that playbook, and his possession and recent access (and, upon information and belief, review) of it can only serve to reinforce and refresh the confidential, proprietary, and trade secret information that Mr. Imhof contains in his memory.

30.    On information and belief, on April 24, 2009, Mr. Imhof deleted information from his hard drive.  On information and belief, on that date, Mr. Imhof also copied additional competitively sensitive documents to an external drive.  Those copied documents include a document saved as NDV Business plan.pptx.  This document is a presentation entitled "2009 NY Division Business Plan," dated October 30, 2008, and includes American's current 2009 business development plan, with objectives, key clients, allocation of resources, and marketing and sales initiatives delineated, and it is competitively sensitive.

11

31.    Moreover, Mr. Imhof's recent copying and review of this information is particularly troubling because it likely refreshes all of American's specific and current New York goals and strategies in Mr. Imhof's mind.  On that basis, Mr. Imhof cannot help but use that information in his intended employment with Delta to American's disadvantage.

32.    Upon information and belief, Mr. Imhof copied a document saved as, "New York is not the only financial capital in the world it is also the most competitive air travel market in the world.doc."  It, too, is a competitively sensitive document.  It includes proprietary and trade secret information, such as American's analysis of the New York market, what American is doing competitively, its perceived unique advantage, stated value proposition, and commitments in the New York market.  Like the 2009 New York Division Business Plan, Mr. Imhof's copying and recent review of this document is exceedingly troublesome, as he now not only has American's strategies on paper, but they likely have been recently confirmed in his mind.  On this basis, Mr. Imhof's decisions for Delta necessarily will be colored by this trade secret information, and therefore used against American unfairly.

33.    Upon information and belief, Mr. Imhof also copied a document that was saved as "American Airlines in NY Mar 07.ppt."  American spent time and resources to prepare this document and it is a document that a competitor would find useful because it describes American's commitment to New York, perceived value to New York, corporate partnerships, agency relationships, charitable organization, cultural organization, and sports and community sponsorships.  Mr. Imhof's copying and recent review is troubling for the same reasons as with the other documents.

34.    Mr. Imhof's misappropriation immediately caused and will continue to cause American irreparable harm.  Money cannot compensate American for this harm.

12

### E.    American Guards its Competitively Sensitive Information

35.    American takes multiple steps to protect its confidential and proprietary information and trade secrets, including by having certain of its employees, including Mr. Imhof, execute and otherwise agree to confidentiality agreements.

36.    As more specifically described below, Mr. Imhof agreed on multiple other occasions to safeguard the confidential, proprietary, and trade secret information he learned while employed with American.  American has not released him from these obligations, or otherwise provided him consent to disclose any sensitive information.

37.    American requires that certain of its key employees, including Mr. Imhof, attend Business Ethics & Compliance Training and execute a yearly Compliance Certification certifying that they will comply with American's Standards of Business Conduct.  American publishes its Standards of Business Conduct on Jetnet, its internal computer system, and on the company's Web site at www.aa.com.  As recently as last year, Mr. Imhof certified that he was in compliance with American's Standards and that he understood that when he joined the company he agreed not to use for his personal benefit, or to disclose to others, company trade secrets or other confidential information.  He certified that his obligation was a permanent one that continued even after his employment with the company ends.  Mr. Imhof's certification further agreed that family members, friends, and, most importantly, future employers are among those with whom he cannot share company trade secrets and other confidential information.

38.    American also takes steps with its customers and travel agencies to ensure that those customers and agencies do not reveal American's confidential and proprietary information, such as discounts and incentives, to its competitors.  It is American's policy and practice to require its corporate clients and travel agencies to execute contracts containing confidentiality and non-disclosure clauses that prohibit these clients from disclosing to third

13

parties the terms and conditions of their contracts with American.  The Passenger Sales

organization is directed to follow that practice and it does, in fact, do so.

        39.     American also takes steps to safeguard information on its computer

systems.  By way of example, American houses its corporate contract terms and its data

assessing those contracts' performance on a proprietary system called PRISM.  PRISM is

password protected, and access is restricted to select headquarter personnel and the sales division

managing the specific accounts.  As the senior-ranking employee within the New York Division,

Mr. Imhof had access to PRISM.

        40.     American also offers some of its employees deferred and performance-based

compensation.  To participate in and receive compensation under these plans, American

requires these employees to agree to keep company information confidential.

        41.     Mr. Imhof has received substantial compensation in deferred compensation and

performance shares since at least 2005.

        42.     Each of the plans pursuant to which Mr. Imhof received compensation since at

least 2005 required him to agree that he would not use or disclose American's confidential,

proprietary, and trade secret information.  Mr. Imhof so agreed, and further agreed that his

failure to abide by this obligation would result in the award being immediately forfeited in its

entirety.

        43.     Mr. Imhof already has breached these agreements by forwarding the New York

Passenger Sales presentation to someone outside the company without authorization.

Mr. Imhof further has breached these agreements by copying certain information from his

company computer to a personal external drive for his own and, upon information and belief,

Delta's benefit.

44.     Moreover, Mr. Imhof's employment with Delta in the position that he has accepted will necessarily cause him to engage in business with American's customers (including corporations and travel agencies) and help formulate Delta's strategies and contracts, which necessarily would require him to reveal American's confidential, proprietary, and trade secret information.  This disclosure would provide Delta with an unfair advantage in the marketplace and cause unfair competitive harm to American for which there is no adequate monetary remedy.

**F.     Mr. Imhof's Intended Employment with Delta.**

45.     On April 28, 2009, Mr. Imhof resigned his position with American.  At that time, he expressed his intention to become employed by Delta in a high-level strategic position managing Delta's passenger sales in the New York area -- a position virtually identical to the position he held at American for the New York Division.  Delta is one of American's primary competitors globally, and American's number one competitor in New York.  When he resigned, Mr. Imhof told at least one American employee that he would not start working for Delta immediately.  However, American discovered on Friday, May 1, 2009, that Mr. Imhof may have commenced employment with Delta on or about April 30, 2009.

46.     Upon learning that Mr. Imhof may have commenced his employment with Delta, American, through its outside counsel, delivered a letter to both Mr. Imhof and Delta on Monday, May 4, 2009.  American reminded Mr. Imhof of his obligations to American, and requested that he refrain from undertaking specific actions that would cause him to reveal competitively sensitive and trade secret information for Delta's benefit.  American further informed Delta that it expected Mr. Imhof to comply with his obligations to American, as are reinforced by Delta's own Code of Ethics and Business Conduct, which provides that Delta does

not "use unfair practices against competitors, such as: stealing or misusing competitors' trade secrets." Accordingly, American requested that Delta undertake actions to ensure that American's confidential, proprietary, and trade secret information is protected, and that it confirm the steps that it would take.

47.     On the afternoon of May 5, 2009, American discovered troubling items. First, an examination of Mr. Imhof's hard drive on his company-issued laptop indicated that Mr. Imhof had deleted documents and e-mails from his laptop. Second, a review of Mr. Imhof's e-mails -- which had been saved to American's e-mail archive since earlier in the year pursuant to a litigation hold in another matter -- revealed that he had negotiated his agreement with Delta using his company e-mail account, and that he had forwarded certain confidential, proprietary, and trade secret information to a personal e-mail address presumably belonging to a relative, upon information and belief, as soon as he determined that the terms of employment with Delta were acceptable. Accordingly, American contacted Mr. Imhof's and Delta's attorney on May 6, 2009, both by letter and telephone, revealed this new information, and requested that Delta conduct an investigation, that Delta take all steps necessary to ensure that American's information is protected, and that Mr. Imhof and Delta preserve electronically stored information.

48.     On May 6, 2009, Delta also confirmed that it had instructed Mr. Imhof not to conduct any business and not to contact any customers, including those customers with whom he worked while at American.

49.     American and Delta then worked out the terms by which Delta's and Mr. Imhof's counsel could review this new information, without revealing it to Delta and while protecting its confidential, proprietary, and trade secret nature. On May 6, 2009, Delta also

16

confirmed that it had instructed Mr. Imhof not to contact any customers with whom he worked while at American.

50.     Delta later confirmed that, upon receiving our letter dated May 6, 2009, it relieved Mr. Imhof of all duties pending its investigation.  Delta also agreed that it would notify American twenty-four hours before returning him to active employment.  Delta notified American at approximately 10:30 a.m. on May 12, 2009, that it intends to return Mr. Imhof to active status at 10:30 a.m. on May 13, 2009.

51.     American has undertaken all reasonable efforts to ensure that Mr. Imhof and Delta will not unfairly use American's confidential, proprietary, and trade secret information.  However, despite American's repeated requests, Mr. Imhof and Delta have not provided American with any assurances or description of how Mr. Imhof can perform his duties without using or disclosing American's proprietary, confidential, and trade secret information.  Indeed, Delta and Mr. Imhof do not deny that Mr. Imhof has this information in his memory.  Rather, Delta and Mr. Imhof simply rely on the fact that Mr. Imhof's employment was not subject to a non-compete clause.

52.     There is a substantial threat that Mr. Imhof will disclose, share, or use American's competitively sensitive information by taking his intended position with Delta.  It is inevitable that Mr. Imhof will be called upon to, or will unwittingly, disclose or use American's confidential, proprietary, and trade secret information.  Mr. Imhof cannot perform his new job with Delta without disclosing, and certainly not without using, American's competitively sensitive information.

53.     Mr. Imhof's employment at Delta thus poses a threat of irreparable injury to American in the form of: (i) exposure of American's confidential and proprietary information

17

and trade secrets to a competitor and the unfair competitive disadvantage to American that would result, and (ii) disruption of American's relationships with existing and potential customers in New York State (and beyond). Because Mr. Imhof has such intimate knowledge of the most confidential terms of American's route profitability and reasons for sustaining certain routes, deals with corporate clients, travel agencies, and other customers, and American's strategies for marketing, pricing, and expanding New York market share, Mr. Imhof's joining a competitor like Delta in his intended position would present a critical danger that American's plans and relationships with customers and travel agencies would be undermined. American cannot be adequately compensated by money damages alone for these types of harms to its business and relationships.

54.    Mr. Imhof's intended employment with Delta also would violate his obligations contained in American's Standards of Business Conduct, his agreements with American, and Delta's Code of Conduct.

55.    Mr. Imhof's association and employment with Delta will result in the disclosure or use of American's highly valuable confidential, proprietary, and trade secret information that he learned while employed at American, resulting in far-reaching irreparable harm to American.

56.    Despite American's best efforts to amicably resolve this situation, Delta has informed American that Mr. Imhof intends to proceed with his proposed employment, and Delta has informed American that it intends to allow Mr. Imhof to assume duties for Delta at 10:30 a.m. on May 13, 2009.

## FIRST CLAIM FOR RELIEF
### (Declaratory Judgment)

57.    American incorporates by reference the allegations contained in paragraphs 1 through 56 above as if fully set forth in this claim for relief.

58.    American's Standards of Business Conduct, its agreements with Mr. Imhof, and Delta's Code of Conduct preclude Mr. Imhof's intended employment with Delta because Mr. Imhof has misappropriated American's confidential, proprietary, and trade secret information.

59.    Mr. Imhof cannot undertake his intended employment with Delta without disclosing American's confidential, proprietary, and trade secret information, in violation of his obligations under American's Standards of Business Conduct, Delta's Code of Conduct, Mr. Imhof's agreements with American, and applicable law.

60.    Mr. Imhof, however, continues to express intent to immediately begin calling on customers whom he previously called on while at American, negotiating agreements, helping develop Delta's New York passenger sales strategy, and implementing that strategy. Mr. Imhof cannot take on this position at Delta with virtually identical responsibilities to the position he held at American without disclosing American's confidential, proprietary, and trade secret information.

61.    Accordingly, an actual controversy exists between American and Mr. Imhof regarding the enforceability of the confidentiality agreements contained in the Standards of Business Conduct, Delta's Code of Conduct, and Mr. Imhof's agreements with Delta, as well as Mr. Imhof's obligations under applicable law.

Dallas 277284v5

62.    American desires a judicial determination and a declaration of the respective rights and duties of the parties herein.  Such a determination and declaration is necessary and appropriate so that the parties may ascertain their respective rights and duties.

### SECOND CLAIM FOR RELIEF
### (Anticipatory Breach and Breach of Contract: The Agreements)

63.    American incorporates by reference the allegations contained in paragraphs 1 through 62 above as if fully set forth in this claim for relief.

64.    In each year since 2005, Mr. Imhof has received deferred compensation, options, or performance shares that allow him to receive grants of American common stock or other compensation issued pursuant to the relevant plans.

65.    Since at least 2005, each time by receiving compensation pursuant to one of these plans, Mr. Imhof has agreed to refrain from:  disclosing any trade secrets of, or other confidential/restricted information of, American to any unauthorized party; making any unauthorized use of such trade secrets or confidential or restricted information during his employment with American or after such employment is terminated; and soliciting any current employees of American to join him at his new place of employment after his employment with American is terminated.

66.    These agreements further provide that if Mr. Imhof violates any provision of the confidentiality provisions contained therein, he will forfeit the entire award.

67.    American relied on Mr. Imhof's promises, and, as a result, provided him with substantial compensation under the terms of the plans and the agreements, as well as proprietary and trade secret information, as more fully described above.

68.     Mr. Imhof has accepted the benefits of these deferred compensation and performance share plans, and American has fully performed its obligations under the plans and agreements.

69.     Mr. Imhof has repudiated the agreements by indicating his intent to immediately and imminently breach the terms of his agreements, and thus has anticipatorily breached the agreements.

70.     Moreover, Mr. Imhof already has breached the agreements by misappropriating American's confidential, proprietary, and trade secret information.

71.     By accepting employment with Delta, a direct and primary competitor of American, Mr. Imhof either has used or disclosed, or necessarily will be called upon to use or disclose, American's confidential and proprietary information and trade secrets for Delta's benefit and, thus, has or will further breach his agreements with American.

72.     As a direct and proximate result of Mr. Imhof's breach and anticipatory breach, American has suffered and will continue to suffer extensive, irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law.  American will continue suffer this harm unless and until Mr. Imhof is restrained from his current and intended conduct and is compelled to abide by the terms of his agreements.

73.     As a direct and proximate result of Mr. Imhof's breach of the agreements, American has suffered and will continue to suffer additional damages, which continue to accrue in the form of attorneys' fees and costs related to this litigation, and lost business in an amount to be proved at trial.

## THIRD CLAIM FOR RELIEF
**(Breach of Fiduciary Duty)**

74.     American incorporates by reference the allegations contained in paragraphs 1 through 73 above as if fully set forth in this claim for relief.

75.     By virtue of his position at American, the special relationship of trust and confidence reposed by American in him, and the access provided to him to American's confidential, proprietary, and trade secret information, Mr. Imhof was required to act solely in American's interest.  Mr. Imhof also had duties of loyalty and of utmost good faith to American, and was obligated not to subvert or misappropriate American's confidential and trade secret information, assets, business, or business opportunities.

76.     Mr. Imhof breached his fiduciary duties to American when he:  continued to receive and develop confidential, proprietary, and trade secret information; conducted meetings with key American customers without revealing that he was in contact with Delta regarding employment in the same capacity for American's competitor; and he informed key customers that he was considering leaving American to work for Delta.

77.     Mr. Imhof also will necessarily breach his fiduciary duties by using and disclosing American's confidential, proprietary, and trade secret information if he becomes employed by Delta without restrictions.

78.     By Mr. Imhof's breach and threatened fiduciary breach, American has suffered and will continue to suffer extensive, irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law.  American will continue to suffer this harm unless and until Mr. Imhof is restrained from taking further actions in breach of her fiduciary duties to American.

Dallas 277284v5

79.     As a direct and proximate result of Mr. Imhof's breach of his fiduciary duties, American has suffered and will continue to suffer additional damages, which continue to accrue in the form of attorneys' fees and costs related to this litigation, and lost business in an amount to be proved at trial.

80.     Mr. Imhof committed his actions knowingly, willfully, and in conscious disregard of American's rights.  Accordingly, American is entitled to recover actual and exemplary damages in an amount to be determined at trial.

### FOURTH CLAIM FOR RELIEF
**(Misappropriation of Trade Secrets and Inevitable Disclosure of Trade Secrets and Confidential Information)**

81.     American incorporates by reference the allegations contained in paragraphs 1 through 80 above as if fully set forth in this claim for relief.

82.     As a result of his employment with American, his repeated affirmations to comply with American's Standards of Business Conduct, and his acceptance of certain compensation that was subject to the confidentiality provisions contained in the written agreements, Mr. Imhof developed, used, received, and had knowledge of American's confidential, proprietary, and trade secret information.

83.     This confidential and proprietary information and trade secrets have independent economic value and were not generally known to or readily ascertainable by persons other than American.

84.     American has made and continues to make reasonable efforts to maintain the secrecy of this confidential and proprietary information and trade secrets.

85.     Upon information and belief, Mr. Imhof threatens to disclose or use American's trade secrets, or has already done so, without the express or implied consent of

23

American, for his own benefit and the benefit of Delta. Such a use constitutes a violation of New York law.

86.    As a direct and proximate result of the threatened or actual misappropriation of trade secrets and confidential and proprietary information by Mr. Imhof, American has suffered and will continue to suffer extensive, irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law. American will suffer this harm unless and until Mr. Imhof is restrained from his current and intended conduct.

87.    As a direct and proximate result of Mr. Imhof's threatened or actual misappropriation of trade secrets and confidential and proprietary information, American has suffered and will continue to suffer additional damages, which continue to accrue in the form of attorneys' fees and costs related to this litigation, and lost business in an amount to be proved at trial.

### FIFTH CLAIM FOR RELIEF
**(Unfair Competition)**

88.    American incorporates by reference the allegations contained in paragraphs 1 through 87 above as if fully set forth in this claim for relief.

89.    By willfully threatening to breach and breaching his contractual obligations and fiduciary duties to American and by misappropriating American's confidential and proprietary information and competitive advantage, Mr. Imhof has acted in bad faith and is engaged in unfair competition against American.

90.    These actions constitute unfair and deceptive trade practices and unfair competition.

24

91.     As a direct and proximate result of Mr. Imhof's unfair and deceptive trade practices and unfair competition, American has suffered and will continue to suffer extensive, irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law.  American will suffer this harm unless and until Mr. Imhof is restrained from his current and intended conduct.

92.     As a direct and proximate result of Mr. Imhof's unfair and deceptive trade practices and unfair competition, American has suffered and will continue to suffer additional damages, which continue to accrue in the form of attorneys' fees and costs related to this litigation, and lost business in an amount to be proved at trial.

93.     Mr. Imhof committed his actions knowingly, willfully, and in conscious disregard of American's rights.  Accordingly, American is entitled to recover actual and exemplary damages in an amount to be determined at trial.

### SIXTH CLAIM FOR RELIEF
### (Violation of Computer Fraud and Abuse Act)

94.     American incorporates by reference the allegations contained in paragraphs 1 through 93 above as if fully set forth in this claim for relief.

95.     American's computers and computer systems are "protected computers" under the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030(e)(2).

96.     By his wrongful action, Mr. Imhof intentionally accessed American's protected computer system, without authorization or in excess of authorized access, and thereby obtained information from American's protected computer system.

97.     By his wrongful actions, Mr. Imhof knowingly and with intent to defraud, accessed American's protected computer system, without authorization or in excess of authorized access.

25

98.    By his wrongful actions, Mr. Imhof furthered the intended fraud, obtained unauthorized use of American's protected computer system, and obtained American's proprietary information, the value of which exceeded $5,000 in any one year period.

99.    By his wrongful actions, Mr. Imhof intentionally accessed American's protected computer system without authorization and, as a result of his conduct, caused American damage and loss.

100.    The wrongful actions of Mr. Imhof have caused loss to American that exceeds $5,000 in any one year period in that American has spent more than $5,000 in responding to the offense, restoring the information damaged on the protected computer system, and conducting a damage assessment.

101.    The activity of Mr. Imhof constitutes a violation of the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)(C), (a)(4), (a)(5)(C), and American is entitled to full compensatory damages under that Act.

### JURY DEMAND

102.    American respectfully requests a trial by jury of this action.

### PRAYER FOR RELIEF

**WHEREFORE**, American respectfully requests that the Court:

A.    Enter a judgment declaring that Mr. Imhof's agreements are valid and enforceable, and that his proposed employment with Delta would cause him to violate the agreements;

B.    Enter a judgment declaring that Mr. Imhof owes American obligations to safeguard its confidential, proprietary, and trade secret information, and that he cannot adequately safeguard this information in his proposed employment with Delta;

26

C.    Enter a temporary restraining order, a preliminary injunction, and a permanent injunction restraining Mr. Imhof, and any person in active concert or participation with him, from entering into an employment relationship or undertaking any job duties whereby he would be called upon to violate the terms of his agreements;

D.    Enter a temporary restraining order, a preliminary injunction, and a permanent injunction restraining Mr. Imhof, and any person in active concert or participation with him, from using or disclosing American's trade secrets and proprietary information to Delta or any other competitor of American;

F.    Enter a temporary restraining order, preliminary injunction and permanent injunction restraining Mr. Imhof, and any person in active concert or participation with him, from

  (i)    revealing any of American's confidential and proprietary information and trade secrets to Delta or any other person or entity, or otherwise violating American's Standards of Business Conduct and his written agreements;

  (ii)   participating in meetings, either directly or indirectly, or otherwise consulting with Delta regarding:

    (a)    back-end or up front travel agency compensation programs or commission policies;

    (b)    corporate contracts or requests for proposal;

    (c)    route profitability or the initiation or discontinuance of any route;

    (d)    sales strategy, including targeted marketing segments, industries, accounts, or desired sizes of accounts;

    (e)    initiatives to deal with fluctuating fuel costs or the economic climate; or

    (f)    competitive strategy vis-à-vis American;

  (iii)  participating in meetings or negotiations, either directly or indirectly, with travel agencies regarding their compensation programs with Delta; or

27

(iv)    participating in meetings or negotiations, either directly or indirectly, with corporate clients or potential corporate clients regarding contracts with Delta.

G.    Enter a judgment declaring that Mr. Imhof should return all of American's property, including records, documents, data, and equipment, and all copies (regardless of the medium in which maintained or stored) of any such property not previously destroyed;

H.    Enter a judgment granting American direct and consequential damages related to business lost as a result of any anticipated breach or breach of Mr. Imhof's agreements or related to any loss caused by Mr. Imhof's actual or threatened misappropriation or disclosure of confidential, proprietary, or trade secret information;

I.    Enter a judgment granting American exemplary damages;

J.    Enter a judgment awarding American its costs and disbursements and attorneys' fees; and

K.    Grant to American such other and further relief as the Court deems just and appropriate.

Dallas 277284v5

Dated: May 13, 2009
New York, New York

MCKOOL SMITH P.C.

By: _____
John P. Cooney, Jr. (JC 2501)
Gayle Rosenstein Klein (GK 2945)

399 Park Avenue
Suite 3200
New York, New York  10022
Phone:  (212) 402-9400
Fax:  (212) 402-9444
gklein@mckoolsmith.com

*Of Counsel:*

MCKOOL SMITH P.C.

Mike McKool, Jr.
300 Crescent Court
Suite 1500
Dallas, Texas  79705
Phone: (214) 978-4000
Fax: (214) 978-4444
mmckool@mckoolsmith.com

*Attorneys for Plaintiff American Airlines, Inc.*

29