UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
AMERICAN AIRLINES, INC.,

                          Plaintiff,


              -against-                                              09 Civ. 4535 (LAK)


CHARLES F. IMHOF and DELTA AIRLINES, INC.,

                          Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## MEMORANDUM OPINION


Appearances:


                    Gayle Rosenstein Klein
                    Mark S. Raskin
                    John P. Cooney, Jr.
                    MCCOOL SMITH, P.C.
                    *Attorneys for Plaintiff*


                    Paul J. Fishman
                    Lance J. Gotko
                    Philip A. Wellner
                    FRIEDMAN, KAPLAN, SEILER & ADELMAN, LLP
                    *Attorneys for Defendant Charles F. Imhof*


                    Harland A. Levy
                    BOIES, SCHILLER, & FLEXNER, LLP
                    *Attorneys for Defendant-Intervenor Delta Airlines, Inc.*


LEWIS A. KAPLAN, *District Judge.*

                    Charles F. Imhof, who was the senior-ranking employee of the New York Sales

2

Division of American Airlines, Inc. ("American"), recently left to join Delta Airlines, Inc. ("Delta") in a comparable position. While at American, he had access to – and, in preparation for leaving, took copies of some – information that American contends constitutes trade secrets and, in any case, is both confidential and competitively sensitive. American now claims that he effectively should be barred from assuming his new position with Delta, at least for some time, in order to protect that information. The Court granted a temporary restraining order, and the matter now is before it on American's motion for a preliminary injunction.

*Facts*

*Mr. Imhof's Role at American*

Mr. Imhof had a 22-year career at American, where he served most recently (from May 2005 until April 2009) as managing director for the greater New York region and reported to the vice president and general sales manager.[1] His position was four rungs below the senior management of the company that consists of the chief executive, operating and financial officers.[2] In other words, he was a member of American's middle management – a skilled and valued employee with considerable experience and important responsibilities, but not one of the company's top executives.

As managing director for sales in the greater New York region, Mr. Imhof's principal responsibility was to improve ticket sales on American flights out of JFK, La Guardia and Newark

---

[1] Imhof Aff. ¶ 9; Stache Decl. ¶ 7.

[2] Imhof Aff. ¶ 10.

3

airports.[3]  Among other duties, he managed the New York division sales organization and participated in the development of sales strategy under the supervision of Kurt Stache, the vice president and general sales manager of American, whose approval was required for significant initiatives.[4]  His responsibilities required familiarity with American's travel agency compensation policies, contracts with and strategies toward major customers, and competitive conditions.[5]

*Events Associated With Mr. Imhof's Job Change*

By April 2008, Mr. Imhof had begun to feel frustrated with his prospects at American. So when the prospect of a job at Delta arose in mid-March 2009, he was interested.  No doubt he would have benefitted from legal advice on how to pass through the difficult period during which he spoke with Delta while still employed by American, as he did not do very well on his own.

The first contact between Mr. Imhof and Delta occurred on March 17, 2009,[6] and the first meeting apparently on March 19, 2009.[7]  Following the initial discussions, he forwarded his communications with Delta to Tom Gleason at HRG Worldwide, one of American's travel agency clients in the New York market,[8] presumably because he was interested in Mr. Gleason's advice.

On March 25, 2009, Mr. Imhof's contact at Delta informed Mr. Imhof that he wanted

---

[3]
      *Id.* ¶ 12; *see also* Stache Decl. ¶ 8.

[4]
      Imhof Aff. ¶ 12.

[5]
      *See* Stache Decl. ¶ 9; Martin Decl. ¶¶ 6-8; Susca Decl. ¶¶ 10-12.

[6]
      Imhof App. ¶ 18; *see* Stache Decl. ¶ 13(a).

[7]
      Stache Decl. Ex. 1 (Mar. 18 and 19, 2009 e-mails).

[8]
      Stache Decl. ¶ 13(b).

4

him to speak with Delta human resources "to help better understand [the proposed] financial package" and inquired whether Mr. Imhof would be available to meet with Delta's chief financial officer, Ed Bastian, and its senior vice president for sales.[9]  By March 28, the meeting with Bastian had been set for April 17, and arrangements for the discussion with human resources had been made.[10]  It appears also that Mr. Imhof met Ms. Grimmet, who runs Delta's New York operation, at about this time, although the precise date is not clear.[11]

　　　　　While Mr. Imhof's discussions with Delta progressed, Mr. Stache of American conducted a corporate account review with Mr. Imhof on April 6, 2009.  During that four hour session, the two reviewed a binder prepared by Mr. Imhof and his staff that identified key accounts and routes and contained additional data.  They discussed also American's account strategies.[12]  Mr. Imhof did not then disclose that he was in discussions with Delta.

　　　　　On April 16, 2009, Mr. Imhof attended American's sales board meeting in Dallas.  The meeting included discussion of what American claims was sensitive competitive information.[13]  American has not, however, identified exactly what was discussed or explained why it believes that it is competitively sensitive.

　　　　　Mr. Imhof then met with Mr. Bastian and other Delta officials on the following day.

---

[9]

　　　　*Id.* Ex. 1 (Mar. 25, 2009 e-mail).

[10]

　　　　*Id.* Ex. 1 (Mar. 28, 2009 e-mail).

[11]

　　　　*Id.* ¶ 13.

[12]

　　　　*Id.* ¶ 14.

[13]

　　　　*Id.* ¶¶ 15-16.

By April 20, 2009, he and Delta began negotiating a term sheet.[14]  A deal was struck, and Mr. Imhof resigned from American on April 28, 2009.[15]  He joined Delta on May 1, 2009.  But there is more to the story than the fact that Mr. Imhof negotiated to join Delta while continuing to do his job at American.

As the chances of his departure from American rose in mid-April, Mr. Imhof began to send e-mails to himself at his family e-mail address that attached documents relating to American's business and/or his work at American.[16]  These included an April 2, 2008 presentation entitled *New York Passenger Sales* that was used to brief Mr. Stache shortly after he assumed his present position (the "PowerPoint").[17]  On April 23, 2009, moreover, Mr. Imhof bought an external hard drive to which he copied both personal and American  documents that were stored in the "My Documents" folder on his American laptop computer.[18]  A few days later, he purchased a Blackberry for the purpose, he says, of transferring the contacts on his American-issued Blackberry to his own.[19]

*Subsequent Events*

---

[14]

     *Id.* ¶ 20 & Ex. 2.

[15]

     Sear Decl. ¶¶ 14-15.

[16]

     Imhof Aff. ¶ 21; *see* Stache Decl. ¶¶ 13, 21.

[17]

     Stache Decl. ¶ 21; Imhof Aff. ¶ 47 & Ex. H.

[18]

     Imhof Aff. ¶¶ 22-23.

[19]

     Imhof Aff. ¶ 24.

     It is impossible to verify this because Mr. Imhof says that he has forgotten the password for his personal Blackberry, and the parties' experts have been unable to access its memory without the password.  *Id.* ¶¶ 24, 33 n.2; Tr., May 20, 2009, at 5:5-20; 30:18-31:13.

As noted, Mr. Imhof resigned from American on April 28, 2009, and told American that he was going to Delta.[20]  American's reaction at first was relaxed.  On the following day, for example, Messrs. Stache and Imhof participated in a conference call with Mr. Imhof's team during which Mr. Stache expressed American's sorrow at Mr. Imhof's departure.[21]  But American's attitude soon changed.  For reasons not apparent from the record, it reviewed e-mails that Mr. Imhof had sent on American's e-mail system and copies of documents that had been stored on his American-issued laptop.[22]  It discovered (1) e-mails between Mr. Imhof and Delta that revealed the course of their discussions, (2) the e-mails Mr. Imhof had sent to his family e-mail address, including most notably that which included the PowerPoint, *i.e.*, the April 2008 *New York Passenger Sales* presentation, and (3) that Mr. Imhof had copied some American documents to a personal hard drive.[23]  This prompted a demand by American that Mr. Imhof cease working for Delta,[24] which put him on something akin to administrative leave on May 6.[25]

Delta, faced with the imminent prospect of litigation, immediately conducted an internal investigation concerning whether Mr. Imhof had conveyed any American confidential and proprietary information to it.  The investigation concluded that he had not done so, and American does

---

[20]

      Imhof Aff. ¶¶ 25-26.

[21]

      *Id.* ¶¶ 26-29.

[22]

      Stache Decl. ¶ 13.

[23]

      *Id.* ¶ 26; Gandhi Decl ¶ 4.

[24]

      Imhof Aff. ¶ 32.

[25]

      *Id.*; Sear Decl. ¶ 16.

7

not contend otherwise.[26]  Mr. Imhof, for his part, now confesses that the transmission of American

documents to his family e-mail address and his downloading of other American documents to his

personal hard drive were errors.[27]  He has undertaken to destroy or return these materials to American,

at American's option.[28]

*The Lawsuit*

American commenced this action on May 13, 2009.  The complaint seeks a declaration

as to the enforceability of confidentiality provisions contained in American's standards of business

conduct[29] and an injunction effectively barring Mr. Imhof from continuing in Delta's employment,

the latter on breach of contract and fiduciary duty, misappropriation of trade secrets and unfair

competition theories as well as alleged violation of the Computer Fraud and Abuse Act.[30]

American promptly moved for a temporary restraining order and a preliminary

---

[26]

Fisher Decl. ¶¶ 1, 10, 11, 14, 16, 19-21; Sear Decl. ¶ 18; Tr. May 20, 2009, at 9:25-10:11; *see also* Pl. Reply at 1.

[27]

Imhof Aff. ¶ 4.

[28]

*Id.* ¶¶ 33 n.2, 36; Tr. May 13, 2009, at 17:17-18:14; 21:9-12; 32:6-12.

[29]

It purports to seek also a declaration of the enforceability of provisions of Delta's code of conduct and unspecified aspects of Mr. Imhof's agreement with Delta.  Cpt ¶ 61.  American has not suggested any basis on which it might obtain a determination of the respective rights and duties of Delta and Mr. Imhof *inter se.*

[30]

18 U.S.C. § 1030.

8

injunction. The parties conducted expedited discovery, and the Court heard argument[31] on May 20, 2009.

*Discussion*

"A party seeking a preliminary injunction must demonstrate: (1) 'either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor,' and (2) 'irreparable harm in the absence of the injunction.'"[32] The threat of irreparable injury is a *sine qua non*.[33] "[I]f there is no irreparable injury, there can be no preliminary injunction."[34] Moreover, "a clear showing of the threat of irreparable harm" is essential to justify a preliminary injunction.[35] The threatened irreparable harm "must be ... actual and imminent, not remote or speculative."[36] In other words, a possibility of irreparable injury is not enough; a likelihood is required.[37]

---

[31]  None of the parties sought an evidentiary hearing or suggested that there was any factual issue requiring one. *See* Tr., May 19, 2009, at 4:23-7:17.

[32]  *Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 116 (2d Cir. 2009) (quoting *County of Nassau, N.Y. v. Leavitt,* 524 F.3d 408, 414 (2d Cir. 2008)).

[33]  *Buffalo Forge Co. v. AMPCO-Pittsburgh Corp.*, 638 F.2d 568, 569 (2d Cir.1981).

[34]  *Markowitz Jewelry Co. v. Chapal/Zenray, Inc.*, 988 F. Supp. 404, 406 (S.D.N.Y. 1997).

[35]  *See Triebwasser & Katz v. Am. Tel. & Tel. Co.*, 535 F.2d 1356, 1359 (2d Cir.1976); *Cedar Swamp Holdings, Inc. v. Zaman*, 472 F. Supp.2d 591, 595 (S.D.N.Y. 2007).

[36]  *Kamerling v. Massanari,* 295 F.3d 206, 214 (2d Cir. 2002); *accord Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 37 (2d Cir. 1995)*.*

[37]  *See JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990).

*A.      Threatened Irreparable Injury*

As a sufficient threat of irreparable injury is indispensable to a successful preliminary injunction motion, that is the logical starting point for analysis of American's application.  But it is well to deal first with two related matters.

First, American claims that Mr. Imhof misappropriated trade secrets and that this automatically gives rise to a presumption of irreparable injury.[38]  It is striking, however, that it could make this argument without even citing *Faiveley Transport Malmo AB v. Wabtec Corp.*,[39] in which the Second Circuit recently made clear that this "reading [of its prior decisions] is not correct."[40]  Suffice it to say that, in light of *Faiveley,* no such presumption arises on the facts of this case.[41]

Second, it is virtually impossible in a case like this one to separate neatly the assessment  of the threat of irreparable injury from that of the likelihood of an applicant's ultimate success on the merits.  Both the Second Circuit and New York courts:

> "have held 'that an agent has a duty "not to use confidential knowledge acquired in his employment in competition with his principal."' *ABKCO Music Inc. v. Harrisongs Music, Ltd.,* 722 F.2d 988, 994 (2d Cir.1983) (quoting *Byrne v. Barrett,* 268 N.Y. 199,

---

[38]    Pl. Mem. 6-7.

[39]    559 F.3d 110 (2d Cir. 2009).

[40]    *Id.* at 118.

[41]    For one thing, the fact that Mr. Imhof concededly has not communicated any confidential information to Delta and has offered to return or destroy the documents and files he took away from American precludes the conclusion that any trade secrets are likely to be disseminated widely or otherwise irreparable impaired.  *See id.*  Moreover, even if such a presumption did arise in the circumstances of this case, it would have been rebutted except in certain limited respects, all for the reasons set forth below.

> 206, 197 N.E. 217, 218 (1935)). Such a duty 'exists as well after the employment is terminated as during its continuance.' *Id.* (internal quotation marks omitted); *accord L.M. Rabinowitz & Co. v. Dasher,* 82 N.Y.S.2d 431, 435 (Sup. Ct.1948) ('It is implied in every contract of employment that the employee will hold sacred any trade secrets or other confidential information which he acquires in the course of his employment. This is a duty that the employee assumes not only during his employment but after its termination.') (internal citations omitted)."[42]

Evaluation of the threat of irreparable injury and of the likelihood of ultimate success both require consideration of whether the former employee possesses confidential information of the previous employer and whether he is likely to communicate that information to the new employer or otherwise use it to the detriment of the former.  I now turn to those questions.

As noted, Mr. Imhof asserts that he never communicated to Delta any of the American documents that he e-mailed to himself from American or downloaded onto his hard drive.  There is no reason to doubt that assertion, which the Court accepts for purposes of this motion.  American's claim of threatened irreparable injury therefore reduces to the question whether Mr. Imhof is likely to do so in the future or, even if he does not, whether he would be likely to use American's confidential information on behalf of Delta if he is permitted to work there, at least in any capacity that relates to New York region passenger sales and conceivably more broadly.

1.    *Mr. Imhof Is Unlikely to Give American Documents and Computer Files to Delta*

American's suggestion that Mr. Imhof is likely to turn over American documents and computer files to Delta is not persuasive.  True, Mr. Imhof did take copies of certain American documents in anticipation of his joining Delta.  Moreover, there would have been no reason to do so if he did not think that they would have been of some benefit in his new position.  Thus, assuming that

---

[42]
*North Atl. Instruments, Inc. v. Haber,* 188 F.3d 38, 47-48 (2d Cir. 1999).

the materials he took contained confidential information that he acquired at American and that Delta's use of that information would harm American competitively, the irreparable injury requirement would have been satisfied at the moment he made the copies.  But the situation as it then stood stands no more.  Mr. Imhof has learned – by reason of American's claim, Delta's reaction, and consultation with his own newly acquired counsel – that there are substantial limitations on his freedom of action.  He has offered to return or destroy all copies of these materials, at American's option.  Delta, for its part, has made clear that it would not receive these materials if Mr. Imhof sought to convey them to it.[43] In these circumstances, I find that there is no material risk that Mr. Imhof will retain copies of the documents, much less that he would disclose them to Delta.  American therefore has failed to establish the requisite threat of irreparable injury in respect of the copied documents.

2.      *Mr. Imhof's Knowledge – Intent and Inevitable Disclosure*

American claims also that it is threatened with irreparable injury in that Mr. Imhof's head is full of confidential American information that he would use to American's detriment if he were permitted to work for Delta, at least in the near future and in the New York sales position that he has accepted.  This theory is considerably more ephemeral.  Assuming for the moment that the information about which American claims to be concerned enjoys legal protection, American nevertheless would be obliged, in order to demonstrate a threat of irreparable injury, to show that Mr. Imhof actually remembers the information in question and, assuming he does, that he either intends to use, or simply could not avoid using, it to American's disadvantage.

---

[43]    Harlan Decl. Ex. 3 (letter from Ms. Marguerite Taylor to Ms. Gayle Klein, dated May 12, 2009).

> *a.*      *Intent*

I reject at the outset American's contention that Mr. Imhof in fact intends to use confidential American information to American's disadvantage.  While some of his actions suggest that he perhaps harbored such thoughts at the time he agreed to join Delta,[44] an issue I do not now resolve,[45] I am persuaded that he does not do so now.  Regardless of whether Mr. Imhof's copying of American materials in preparation for his departure was ill-intended or simply ill-informed, the ensuing events – which have threatened his reputation and his livelihood – quite likely have taught him a lesson that he will not soon forget.  I am not convinced that American is in any realistic danger of irreparable injury as a result of deliberate misuse by Mr. Imhof of whatever competitively sensitive information he learned in American's employ.

---

[44]

> In this regard, American places great weight on Mr. Imhof's testimony that he copied an American business plan so he could use it as a template for developing a Delta business plan. Pl. Reply Mem. 3-4 (citing Imhof Dep. 56:17-24, 59:25-60:21).  But I am not persuaded that the testimony bears anything close to the weight placed upon it.   A template is something that services as a pattern or guide.  AM. HERITAGE DICTIONARY 1781 (4th ed., Houghton Mifflin Co. 2000).  American evidently interprets Mr. Imhof's testimony as meaning that he intended to use the *substance* of the American business plan – in other words, its intended competitive actions – as a pattern for future actions by Delta.  But the testimony bears a different interpretation as well, viz. that Mr. Imhof intended to use the *form* of the American document as a pattern to guide him with respect to the form of an anticipated Delta document in his new job.  In light of Mr. Imhof's denial that he intended to use any American confidential information in his new job at Delta, I find that his testimony meant to convey the latter thought, not the former.  In other words, I construe Mr. Imhof's testimony as a whole as consistently denying any intention to misuse any American confidential information in his new employment.

[45]

> It is important to note also that, while Mr. Imhof admittedly copied some American documents, he quite plainly did not copy a much greater volume of material that contained information at least arguably as sensitive, or more sensitive, than what he did copy.  Imhof Aff. ¶ 23. This tends to corroborate his contention that he never intended to convey American information to, or use it to benefit, Delta.  *Id.* ¶ 4.

          b.      *Inevitable Disclosure*

Once the notion of likely intentional wrongdoing is put aside, American's motion comes down to the argument that Mr. Imhof would be unable to avoid using American's information if he were to do his job for Delta. Put another way, American contends that Mr. Imhof inevitably will disclose or, more properly, use to its disadvantage valuable information that belongs to American.

"The inevitable disclosure doctrine," as Judge Pauley has written, "is not new."[46] But it does stand in considerable tension with other principles that inform decisions in cases like this.

For one thing, its application can have the effect of binding the former employee "to an implied-in-fact restrictive covenant" not to compete to which the former employee never explicitly agreed.[47] This "runs counter to New York's strong public policy against such agreements and circumvents the strict judicial scrutiny they have traditionally required."[48]

Second, the doctrine, if applied too readily, would tend to suppress healthy competition borne of "the uninhibited flow of services, talent and ideas."[49]

Third, inherent in the doctrine are the "drawback[s] . . . that courts are left without a

---

[46]

        *EarthWeb, Inc. v. Schlack,* 71 F. Supp.2d 299, 309 (S.D.N.Y. 1999).

[47]

        *E.g., U.S. Re Companies, Inc. v. Scheerer,* 41 A.D.3d 152, 155, 838 N.Y.S.2d 37, 40 (1st Dept. 2007) (quoting *Marietta Corp. v. Fairhurst,* 301 A.D.2d 734, 737, 754 N.Y.S.2d 62, 65 (3d Dept. 2003) (internal quotation marks omitted)).

[48]

        *EarthWeb, Inc.,* 71 F. Supp.2d at 310.  *Cf. Reed, Roberts Assocs., Inc. v. Strauman,* 40 N.Y.2d 303, 307, 386 N.Y.S.2d 677, 679 (1976); *Purchasing Assocs., Inc. v. Weitz,* 13 N.Y.2d 267, 272, 246 N.Y.S.2d 600, 604 (1963).

[49]

        *See PSC, Inc. v. Reiss,* 111 F. Supp.2d 252, 257 (W.D.N.Y. 2000) (quoting *Reed, Roberts Assocs., Inc.*, 40 N.Y.2d at 307 (quoting RESTATEMENT (SECOND) OF AGENCY § 396, cmt. b)) (internal quotation marks omitted).

frame of reference because there is no express non-compete agreement to test for reasonableness"[50] and that there are few guideposts for assessment of the likelihood that disclosure or misuse actually will occur.

Accordingly, "the inevitable disclosure doctrine treads an exceedingly narrow path through judicially disfavored territory."[51]  If it is not to abrogate the requirement of "a clear showing" of "actual and imminent" irreparable harm, it must be applied with great care.  This demands consideration of (1) the strength of the showing that the former employee once knew – and still knows – information, the use of which on behalf of a competitor would damage the former employer, a factor that includes the issue whether the information in question is highly technical or specialized scientific data as opposed to perhaps less valuable and sensitive sales or general business management information,[52] (2) the degree of similarity between the employee's former and newly assumed duties,[53] including whether  the newly assumed duties are to be performed on behalf of a direct competitor of the former employer,[54] and (3) the presence or absence of deliberate misappropriation, [55] a factor

---

[50]

*EarthWeb, Inc.,* 71 F. Supp.2d at 311.

[51]

*Id.* at 310.

[52]

*See PSC, Inc.,* 111 F. Supp.2d at 257-58.

[53]

*EarthWeb, Inc.,* 71 F. Supp.2d at 310.

[54]

*Estee Lauder Cos., Inc. v. Batra*, 430 F. Supp.2d 158, 173 (S.D.N.Y. 2006); *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp.2d 525, 532-33 (S.D.N.Y. 2004); *EarthWeb, Inc.*, 71 F. Supp.2d at 309-310.

[55]

*Tactica, Int'l, Inc. v. Atlantic Horizon Int'l, Inc.*, 154 F.Supp.2d 586, 608 (S.D.N.Y.,2001); *EarthWeb, Inc.*, 71 F. Supp.2d at 310.

considered above.  To this list must be added, of course, anything else pertinent to a particular case.


*(1)      Mr. Imhof's Knowledge*

As an initial matter, it is well to bear in mind that we are dealing with an individual responsible for sales of a widely used service as distinct, for example, from a food chemist privy to the secret formula for Coca-Cola or even a salesman for a highly specialized, technical product used only by small numbers of obscure manufacturers.  Anyone knowledgeable about the New York business scene, or with access to publications such as *Crain's New York Business,* readily could come to a reasonably accurate judgment as to the types of businesses that are the largest purchasers of air travel originating from the New York airports, such as the major financial services and communications companies, law firms, and so on.  Nor would it take a genius to figure out that large travel agencies are important.  The marketplace, moreover, is a competitive one.  One seeking to sell air travel to major business entities and large travel agencies would be bound to learn from the customers a great deal about the competitors and the prices and incentives they offer.  That is not to say, of course, that airlines have no valuable confidential information relating to sales.  But it is to say that such claims must be examined carefully so as to avoid placing undue restrictions upon the ability of sales people in the airline industry to change jobs within the industry.  With the context thus in focus, I turn to American's specific claims, beginning with those based upon documents that Mr. Imhof copied before he left and that he has undertaken to destroy or return.


*(a)      The Copied Documents*

American points first to the PowerPoint, the April 2008 presentation entitled *New York*

16

*Passenger Sales* that Mr. Imhof used to brief Mr. Stache when the latter took up his present position. But American vastly overstates its case as to this document. As an initial matter, only six of the 115 pages purport to state American's strategy,[56] and the objectives there stated are so obvious and so general as to be virtually meaningless. It certainly would come as no surprise to Delta to learn, for example, that American hoped to be one of the two top airlines in New York and to build a profitable business catering to corporate and leisure travelers and that New York is the largest travel market in the United States.[57] And although the document – amidst a welter of public information about New York City, copies of competitors' advertisements and other fluff – does contain some specific information about what American then was doing to pursue those objectives, a good deal of the specific information about American's actions concerned steps taken in the public arena such as sponsorship of cultural and sporting events as well as other actions of which its customers necessarily were aware. Moreover, the New York marketplace for air travel likely has changed dramatically since April 2008 in consequence of the recession and the troubles of the financial services and other New York industries. Thus, while Mr. Stache contends that many of the strategies revealed in the PowerPoint are still in use,[58] American has not pointed to specific information in the document that would give Delta any material advantage even if Mr. Imhof still remembered the details and could not avoid using them. Indeed, much of the information in the document comes from public sources, is

---

[56]
       Imhof Aff. Ex. H, at 4-5, 28-29, 32, 35.

[57]
       *See id.* at 4.

[58]
       Stache Decl. ¶ 23.

stale, has been made public, or is readily available to the competition.[59]

American relies also on three other documents copied by Mr. Imhof.[60] But its showing as to these is little more impressive. Like the PowerPoint, the first of these is written at a high level of generality[61] and contains much information that is publically available.[62] Moreover, American has failed to point to specific information that would give Delta a materially competitive advantage, assuming Mr. Imhof remembered it. As to the second document, even Mr. Stache does not claim that it contains competitively sensitive information, confining himself to the assertion that "a competitor would find [it] of use because it describes American's commitment to New York, perceived value to New York, corporate partnerships, agency relationships, charitable organization, cultural organization, and sports and community sponsorship"[63] – in other words, it contains information that is obvious, readily available to everyone, or of no real importance. Moreover, this document, as well as the third, are talking point documents that Mr. Imhof used to speak publicly about American and its commitment to New York, so they are hardly secret.[64] Indeed, these documents contain nothing materially different from what was in the PowerPoint.

---

[59]    Imhof Aff. ¶¶ 47-54.

[60]    Stache Decl. ¶¶ 26-28 & Exs. 4-5 (redacted); *see also* Levy Decl. Exs. 5, 7-8 (unredacted).

[61]    Levy Decl. Ex. 7. For example, American's listed objectives included "[w]ork to gain disproportionate share and revenue growth . . ." – in other words, the objective of most competitive businesses.

[62]    *Id.* (listing "existing high profile, high impact sponsorships" and "existing partners").

[63]    Stache Decl. ¶ 28.

[64]    Imhof Aff. ¶¶ 45-46; Levy Decl. Exs. 5, 8.

18

To be sure, Mr. Stache claims that these three documents contain at least some competitively sensitive information.  But it is far from clear that this is the case, let alone that Mr. Imhof would be likely to remember that information and that he unavoidably would use it to American's disadvantage were he to work for Delta.  In consequence, American's showing based upon these documents falls considerably short of the "clear showing of the threat of irreparable harm" necessary to warrant a preliminary injunction.[65]

(b)      Mr. Imhof's Memory

American does not rest alone on the premise that Mr. Imhof is bound to remember and use against it the content of the handful of documents referred to above.   It claims also that he was exposed to an abundance of other confidential information that he inevitably will use to Delta's advantage, by virtue of the close correspondence of his jobs at Delta and American, even assuming his good faith.   This includes American's strategies for contracts with certain major financial institutions including information regarding its program for tiering and tying with J.P. Morgan and perhaps others, American's practice of so-called "stealth pricing," the expiration dates of key corporate contracts, specific overseas markets targeted by American, and the details of American's relationship with Credit Suisse.[66]  But these claims are generalities, easily voiced and, to a great degree, devoid of real content.   For example, the claim that Mr. Imhof has been exposed to American's strategies for contacts with financial institutions may mean nothing more than that he

---

[65]

*See Triebwasser*, 535 F.2d at 1359; *Cedar Swamp Holdings, Inc.*, 472 F. Supp.2d at 595.

[66]

Martin Decl. ¶¶ 6-14.

knows that American's strategy for financial institutions is to offer a price lower than the competition whenever doing so would be to American's advantage.  But American has been quite reticent concerning the details to which Mr. Imhof allegedly has been exposed.

    The lack of detailed information concerning what Mr. Imhof allegedly knows and why it is both confidential and important means that American essentially asks me to accept the word of those of its personnel who have described these matters in the most general of terms for the proposition that the details, whatever they may be, in fact would be harmful to American if used against it by Mr. Imhof at Delta.[67]  But, at the risk of banality, the devil is in the details.  Without them, it is extremely difficult for me to know exactly what information American fears that Mr. Imhof inevitably would retain in his memory -- if the details are voluminous and complex, the likelihood is small whereas retention of a few simple and extremely salient points would be another matter.  It is extremely difficult also to evaluate the claim that the details, even if retained, would likely be used against American with any material effect, let alone a material effect that could not be compensated

---

[67]    American's Mr. Susca, for example, says that Mr. Imhof participated in discussions concerning which routes to service from New York, types of incentives to give to travel agency representatives, pricing strategy for existing and prospective accounts and types of strategic promotions.  Susca Decl. ¶¶ 9-13.  But there is little or nothing in his declaration to justify a conclusion that these discussions concerned much if anything that was not general knowledge in the industry or the sort of things that any sales executive in any industry would know or think of simply by virtue of working in sales.  Perhaps the closest he comes to giving details is his contention that Mr. Imhof reviewed MIDT and PRISM aggregated data, looked at average ticket values and yields, and came to a conclusion about whether to recommend that American consider establishing new service to particular destinations.  Id. ¶ 10.  But this is insufficient.  For one thing, the MIDT and PRISM data are available to the entire industry rather than proprietary to American.  Imhof Aff. ¶ 51.  Although competitors cannot purchase PRISM information specific to American, Susca Decl. ¶ 22, competitors can and do receive summarized PRSIM data regarding other airlines.  Imhof Aff. ¶ 51.  American provides no evidence concerning the particular PRISM data Mr. Imhof reviewed.  Nor is there any evidence regarding the volume of any of the data and when this discussion or these discussions allegedly took place.

by damages.[68]

### (2)   Similarity of Positions

American stands in a much stronger position with respect to the similarity of Mr. Imhof's former and present positions.  There seems little doubt that Delta hired Mr. Imhof to perform the identical or nearly identical role he played previously for a direct competitor.  This favors American, because whatever Mr. Imhof knows concerning New York area sales is relevant to his responsibilities at Delta, which increases the likelihood that he could not avoid using his knowledge in a manner that would be to American's disadvantage.

*   *   *

As the foregoing demonstrates, American has not made a very convincing case that Mr. Imhof today knows protectible information of substantial sensitivity and that he inevitably would use in a manner detrimental to American.  While any confidential information he may carry in his head almost surely would be relevant to his new duties, I decline to find that he likely would use it intentionally, and American's showing as to inevitable disclosure is weak given the lack of detail as to what Mr. Imhof knows and its commercial importance.  So I would be justified in concluding that American has failed to sustain its burden of demonstrating a clear and imminent likelihood of irreparable injury absent an injunction.  But it seems unlikely that Mr. Imhof, a veteran of 22 years with American, most recently in a highly responsible position, has left the company with his mind a

---

[68]    Suppose, for example, that Delta, having employed Mr. Imhof, managed to capture an account formerly held by American.  The damages attributable to the loss of the account readily could be determined in the event that American were able to prove that Mr. Imhof played a role in formulating Delta's approach to the customer and that Delta's approach benefitted from knowledge derived from Mr. Imhof of American's previous history with that account.

*tabula rasa.*   So I assume for purposes of analysis that he has retained some information that American properly regards as secret and competitively sensitive, and I assume further that Mr. Imhof would be unable, even in the best of good faith, to put everything of that nature that he recalls out of his mind in doing his job at Delta.   Accordingly, I assume that there would be at least some risk of some irreparable injury to American if he were to return to his employment at Delta.   But this assumption does not go very far, as American has not supplied evidence to justify the conclusion that the risk is very high or that the extent of the threatened injury would be very great.

B.      *Likelihood of Success on the Merits*

As the foregoing discussion indicates, there are very substantial questions as to the likelihood that American will prevail on the merits.

First, American is not likely to prevail on the ground that Mr. Imhof is likely to breach the duty he concededly owes American by  intentionally disclosing or using to American's detriment any confidential American information that he may have.

Second, American has not demonstrated a likelihood of success on its inevitable disclosure theory, essentially because it has failed to show that Mr. Imhof carries in his head specific confidential information that would be of any material benefit to Delta.   This is so even though the similarity of his new and old positions would make the use of any such information that he might have likely.   Nevertheless, as indicated above, the circumstances are such that American's inevitable disclosure theory cannot be rejected out of hand.   Accordingly, I assume, without deciding, that it presents a substantial question that is a fair ground for litigation.   The propriety of a preliminary injunction therefore ultimately rests on a balancing of the equities.

C.      *The Balance of Hardship*

        In considering the equities, "I must . . . determine if 'the harm which [American] would suffer from the denial of [its] motion is "decidedly" greater than the harm [Mr. Imhof] would suffer if the motion is granted.'"[69]  In this case, that is not a close question.

        The issuance of a preliminary injunction here effectively would prevent Mr. Imhof from going to work for Delta.[70]  While it appears that Delta has continued to pay him to remain idle while this motion has been litigated, there is no assurance that it would continue to do so while the case is litigated to judgment.  Mr. Imhof therefore faces a real possibility that he would lose his Delta job if this injunction were granted.   As a practical matter, moreover, the issuance of an injunction here would prevent him from working for any airline, the industry to which he has devoted more than two decades, in any position relating to sales in the New York region.  This would make it quite unlikely that Mr. Imhof, a 49-year old man with a family to support during troubled financial times, could find employment, at least at a comparable level of compensation.   The hardship that he faces therefore would be substantial.

---

[69]

        *Holford USA Ltd. v. Cherokee, Inc.,* 864 F. Supp. 364, 374 (S.D.N.Y. 1994) (quoting *Buffalo Forge Co.*, 638 F.2d at 569) (second alteration in original).

[70]

        Stache Decl. ¶ 44 ("I do not believe there is any way that Mr. Imhof can perform his new job with Delta without disclosing, and certainly not without using, American's competitively sensitive information."); *Id.* ¶ 45 ("Because Mr. Imhof has such intimate knowledge of [American's] . . . most confidential terms . . . Mr. Imhof's joining a competitor like Delta in his intended position would present a critical danger that American's plans and relationships with customers and travel agencies would be undermined.").  While American's counsel stated at oral argument that it would not object to his working at Delta in another geographic area, the facts remain that Mr. Imhof does not wish to leave New York – indeed, he left American in part because he was unwilling to leave New York, which would have been necessary for him to advance in the company – and that Delta has hired him to work in this market.

23

American, on the other hand, faces no comparable risk.  While I have assumed that there is some possibility of irreparable harm, the nature and extent of any such harm is quite speculative.  It surely cannot be assumed to outweigh the hardship likely to confront Mr. Imhof in the event he were wrongfully enjoined, let alone to do so "decidedly."

*Conclusion*

For the foregoing reasons, American's motion for a preliminary injunction [docket item 3] is denied in all respects.  The foregoing constitute my findings of fact and conclusions of law. And while the foregoing disposes of this motion, one other comment is appropriate.

If American were as deeply concerned about the risk of Mr. Imhof going to work for a competitor as it now professes, it had the means to prevent it.  It could have offered Mr. Imhof an employment contract containing a reasonable covenant against post-employment competition.  Had it done so, and had Mr. Imhof accepted, American would not be in the position of which it now complains.  Whether it declined that option because it wished to preserve its flexibility to discharge Mr. Imhof at will if that had seemed desirable or for some other reason, it has only itself to blame. Its effort to obtain the substantial equivalent by judicial decree without paying for it and to do so on the basis of vague claims of trade secrets and confidential information is not especially appealing.

SO ORDERED.

Dated:          June 3, 2009

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)